May it please the Court, Sam Voll for Plaintiff's Appellant's Education Logistics and Logistics Management. I'd like to reserve five minutes for rebuttal. All right. This appeal involves a damages award issued by a jury after a two-week trial. I'm going to focus on three points. One, the contract-specific fees and royalties awarded by the jury, including annual license fees or direct breach of contract damages. Two, the jury's damages award is supported by ample causation evidence. Three, it was well within the trial court's discretion to allow Mr. Beaton, plaintiff's expert, to testify. At trial, Edgelog, and this is the industry name for our client, only sought to recover fees and royalties specifically called out in the party's agreement. Royalties under sections 4.2 and 4.4 and fees and license fees under section 4.7. Each of these clauses says Laidlaw will pay these fees. In its briefing, Laidlaw makes several references to lost profits. The damages that Edgelog sought are not marketplace lost profit damages. They sought specific contractually mandated fees and royalties. They are only lost profits because like in any direct damages case, Edgelog is not entitled to recover gross fees or gross royalties. Rather, we had to subtract out the costs that would have been incurred had Laidlaw fulfilled its best efforts obligations. The fees and royalties sought relate to specific Laidlaw customers, not prospective customers, not unidentified customers, not hypothetical customers, actual customers for past behavior by Laidlaw, for past breaches of its obligation to use its best efforts to promote school districts. Well, the annual fees, where are they in the contract? So the annual fees are section 4.7.3 fee, and with respect to the annual fees, so section 4.7.3, that's a fee that is paid in which the school district gets a license, Laidlaw pays the fee, Edgelog gives the license to the school district, and the school district gets a one-year license that's undisputed. And at the end of that one-year license, if the school district is to remain licensed, Laidlaw pays the annual license fee under section 4.7. Again, Laidlaw pays that fee, and the school district gets another year of the license. That is undisputed. That was the trial testimony. That's precisely what happened in practice. Laidlaw would pay an initial fee, the school district would get the license, the license would expire, and Laidlaw would pay a subsequent section 4.7.3 fee. In order for Laidlaw to get the benefit of section 4.7.3 and to allow it and the school district to both access the software, they had to pay that fee. And maintenance? Maintenance, it's called annual license and maintenance fee. It's a license fee. Just like with the initial license fee, the school district gets maintenance with the initial license fee, it gets maintenance with the annual license fee. But the point is that while you are licensed, you are allowed to use the software, you will get every upgrade that is offered during that time, you're entitled to maintenance from Edgelog during that time. That's true under the initial license that you pay, and it's also true with respect to the fee that is paid each subsequent year to remain licensed. That's $1,000 every year, right? No, that is 12% of the license fee each year. The $1,000 fee is the section 4.7.1 fee, and that's for if only Laidlaw is going to use the software, the school district is not allowed to access the software, Laidlaw pays a one-time $1,000 fee for Laidlaw to be able to use the software for the school district. One more point on this direct damages, consequential damages issue. We have school districts such as the Francis Howell School District, the Navasota Independent School District, the Northwest R1 School District, South Kingstown and Rhode Island School District, and these school district names go on and on and on. These are all school districts where Laidlaw admits, the school districts left it to us to implement software. They left the decision of what software to use to us, and Laidlaw didn't implement Edgelog, they didn't use any effort to promote Edgelog, only because, gee, if we do that, we're going to have to pay a fee on royalty. That's the necessary result of the breach. That's direct breach. Those are direct breach of contract damages. I'd like to talk just a little bit more about causation. In addition to the specific school districts, we have several general statements made by Laidlaw employees. The top two employees in their computerized routing division. The head of their computerized routing division made it very clear that Laidlaw customers look to Laidlaw to make decisions with respect to how to route, whether to implement software. This is Laidlaw's responsibility. For example, he says, when it was appropriate to communicate with our school district customers about what we were doing specifically in a routing capacity, we did so. But in most cases, our customers look to us as the routing experts, and they depend on us, that's Laidlaw, to determine and implement and utilize a solution on their behalf. And Mr. Parker could not think of a single instance in which a school district had ever objected to Laidlaw proposing the use of Edgelog routing software. Not a single instance. No exceptions. And his testimony was corroborated with respect to school districts deferring to Laidlaw to make these decisions was corroborated by the second highest ranking employee in the computerized routing division, Colton Graham. If you look at pages 55 and 56 of our response reply brief, you'll see along, you know, we have this information as well as other information, but if you look at those excerpts of record, you will find this testimony. It is very clear, and it's undisputed. May I ask a question? I'll ask Laidlaw's counsel as well that's been bothering me, and I'm just trying to understand the trial. Sure. And that is the issue of consequential damages, because that's where we're ending up on this judgment as a matter of law. Do they fall in this box or do they fall in that box? And that wasn't determined before trial. However, during the discussion of the jury instructions, I noticed that there is some discussion about whether you should have a consequential damages instruction, which just from the outside it would seem to make sense. If you have to know is it in this box or that box, you might have such an instruction. But then there's this colloquy between the court and the parties, and the court says, well, then the licensing, maintenance, and royalty fees are not consequential damages. And then there's talk about, well, if I don't give a consequential damage instruction, I don't think this one is necessary either. And basically, although a consequential damages instruction was proposed, it doesn't really get offered in the end. Why not? Right. Well, so from our perspective, none of these damages were consequential damages. Laid law had a consequential damages instruction. Laid law withdrew that consequential damages instruction. It's their burden of proof. If they want to argue that they're consequential damages, they should have submitted the consequential damages instruction. So now that's my other question is since it wasn't in the jury instructions and then it doesn't find its way into a special verdict form in any way, what is your view on whether the issue of consequential damages is a pure legal one or is it fact legal? Right. In general, the issue of consequential damages is a fact question. Laid law's own citations support this. For example, the Platt electric supply case out of the District of Oregon, the court says the proper characterization of a particular claim of damages as either direct or consequential is an issue of fact which the jury must decide. That's at star three. The only where the evidence is clear and undisputed and the law is clear cut may the court rule as a matter of law. Well, here the evidence is undisputed, but the evidence is undisputed that the parties, for example, on these annual license fees treated them as section 4.7.3 fees. They were fees that were paid by laid law at the end of each year in order to allow the school district to remain licensed. And so under the invited error doctrine, when laid law, it's their affirmative defense, they bear the burden of proof. When they withdraw their consequential damages instruction, they're waiving it. You know, we've gone through a lot of huge cost and expense of going to trial and they had an opportunity to make that point. They had an opportunity to argue that to the jury and they didn't do that. I'd like to talk briefly about Mr. Beaton. And I'd like to talk about what he did. Mr. Beaton is the damages expert for education logistics. And what he did was he took evidence compilations, evidence summaries, unobjected to evidence summaries and school district license values and he calculated a specific net lost fee in royalty for specific laid law customers. Why did he do this? He did it so that if the jury determined that liability and causation had been shown for any specific laid law customer, the jury had the damage number that related to that specific laid law customer. And his calculations were not particularly objectionable. After Mr. Beaton laid a foundation for what he did, his school district specific spreadsheets were admitted into evidence without objection. Laid law now argues that they objected to these school district spreadsheets. They did so in a preliminary pretrial statement. But that was preliminary pretrial. We went to trial and after we laid the foundation, they were entered without objection. And the jury had these school district specific numbers and they took them back into the jury room with them. And Mr. Beaton left the choice for which school district damages would be appropriate to the jury. He was asked about this by Laid Law's trial counsel. Question, you haven't presented the jury with any middle ground on this, right? It's 100% or nothing. Answer, no, they have that choice. I'm not saying it's 100% or nothing. Went on to testify, ultimately it's going to be the jury's decision on what it believes is appropriate for the circumstances that we have here based upon not just my opinions but all the information that's been provided here. So the jury had his unobjective to school district specific spreadsheets. The jury had school district specific liability and causation evidence. Laid Law's lawyers had the opportunity during closing to talk to the jury about the school district specific liability evidence, about the school district specific causation evidence, and about the damages figures. The jury received an instruction on causation and damages, Laid Law's instruction. The jurors went back to the jury room. They had all the information they needed to apportion damages on a school district specific basis that had been established by the evidence. And clearly they did that. They asked for seven calculators. And they didn't award 100%, and they didn't award the 0% requested by Laid Law. They ran their own numbers and came up with a calculation. Did you want to save your remaining time? I do, thank you, Your Honor. Thank you, Your Honor. May it please the Court, Dan Mason for Laid Law. Let me first address Mr. Beaton's testimony. The district court itself on the post-trial motion filed April 1, 2013, described Mr. Beaton's testimony as follows, very fragile, serious weakness, and weak support. And we think, Your Honor, it's clear under the law that we cited tonight, Circuit McLaren, McGlinchey, and Judge Rothstein wrote an opinion in 2003 in PPA where you went into great detail on how a district judge considers admission of expert testimony. And I have some excerpts from that that I'd like to refer to in a moment. But what was Beaton's analysis? He's a CPA. Did he do what typically is done? You look at a comparable company in the same industry and see how they did? Let me interrupt you a minute. I'm looking forward to hearing my opinion read back to me. But didn't you just not go far enough with the district judge's opinion? He did say all that you said he said. But he also said it went to wait. And he was going to let the expert testify. He did exactly right, Your Honor. He did say it went to wait. And in the Kennedy case, the court said the Daubert duty is to judge the reasoning used in forming an expert conclusion. The test is whether or not the reasoning is scientific. The judge, the trial judge, makes the determination. Is this scientific? Is this appropriate technical evidence? Only then, as the gatekeeper function that the Daubert Supreme Court opinion talks about, only then does the trial judge submit it to the jury. Yes, the judge doesn't decide whether he agrees with it or not. But there is a threshold that the Ninth Circuit courts, district courts have repeatedly said, and the gatekeeper function requires a district judge to make a determination as to the evidence submitted by the expert, whether that reaches a level of scientific accuracy. And what did Mr. Beaton do in this case? Did he look at the record? He said, Your Honors, that for 10 years, Laidlaw, excuse me, Edgelaw would have had 100%. They would have gotten 100% of the market for 10 years, from 2003 to 2013. What does the record show? They had 5%. They went down to 5%. You had your client had an opportunity to cross-examine him on that, and it was put to the jury. And, I mean, I guess I'm struck. I'm having a hard time seeing why this is an abuse of the trial court's discretion. Because the trial judge did not make the initial determination that this was scientifically based. It was simply an opinion that the expert submitted. The expert said, In my opinion, if Laidlaw had submitted and provided its best efforts, then all the school districts would have benefited. It's that simple. It's just an opinion by a CPA who's purporting to say, what, 1,500 school districts throughout the country, from multi-urban school districts to rural school districts, what they would have done. It was not specific as to any particular school district. It's, by definition, a counterfactual inquiry. There isn't going to be any way to know for sure. There's no for sure, but there's a way of doing this. Look at what Laidlaw did when they had 90% of the market. Keep in mind that Laidlaw is only in 10% of the markets. And the other 90%, excuse me, Edgelaw was in 90% of the markets. Presumably, they had every incentive to try to sell. And during that period, they only achieved 5%. And if you look at their sales in this page 49 of our brief, we have the chart, they went from $2 million down to $150,000. Well, now you've moved from the expert's opinion to the jury's findings. The jury heard all of this. They heard where, you know, Laidlaw said it wouldn't happen and would happen. And they came out with numbers and they came out with findings about, you know, best efforts and all. What the expert did was just give an opinion, his opinion on what would happen, one of the factors the jury is going to consider. Why is that an abuse of discretion to let that happen? Because the judge is obligated in a case like this to make sure that the opinion of the expert is based on verifiable scientific evidence. An economist would do a regression analysis. The way one typically does it is you look at other companies in the field. Look at the Alaska rent-a-car case that was decided by this court last year, where the issue was loss of a rent-a-car in Juneau, Alaska. And the expert there looked at Juneau and national trends and compared what really happened in the marketplace to what this particular plaintiff could have done. Here, there was nothing done in connection with looking at what historically Edulog had done. They had gone in their 90% of the market to a five- There's always a fine line, of course, between what do you need for the scientific basis versus whether you just attack that basis, you let it in, and it goes to the weight. Because you're not required to have an economist, and it's not uncommon for companies to use CPAs to present this kind of information. He may not have been the most sophisticated in his analysis, but you're basically asking us to say that the district court abused its discretion to even let him testify, right? I'm saying that based upon how he supported his testimony, which was just flat-out opinion without any basis, without any factual record. Yes, that was an abuse of discretion. The other point that I think is very cogent here is acceleration assumption. Your Honors will recall that in the first appeal here, there were two issues. One was the best efforts clause in perpetuity. The other one was the statute of limitations. And the first panel hearing, this Court said the statute of limitations goes back to January 10, 2003, four years back from when they filed the complaint. So what does Mr. Deaton does? He assumed that every single purchase, installation before 2003 would have happened on 2003. Every single one. And then he assumes that even if a school district had no intention of buying or having installed bus routing software, because a lot of them don't, only 25% of school districts have routing software, he assumed that every single one who had not expressed any interest in having bus routing software would have acquired the software on January 10, 2003. Coincidentally, the day the statute of limitations started to run. Your Honors, there was no basis for that, and you can't undo that. You simply can't undo that.  How can you have an expert assume the conduct that occurred before the statute? Ixo dixo, ixo facto occurred the day the statute started to run. That's exactly what Mr. Deaton said, and it was worse than that. He even assumed the school districts who had never expressed an interest in buying bus routing software would have bought it. It's as if I was trying to show damages for General Motors and I wanted to show how many Chevrolets they would have sold. And then I do a calculation and I include people who don't have a driver's license. Yes, they would have bought a Chevrolet, too. It's exactly what Mr. Deaton did. This acceleration assumption is totally without basis, totally without legal foundation, pure speculation. It is true, Judge Rothstein, it is true that the judge said, yes, it goes to wait. But the case law, and again, I refer the Court to the McLennan case, the McGlinsey case, in all these cases the Court stresses that the district judge has some obligation to determine that there was a legal scientific basis, some factual basis, for the assumptions the expert is submitting. Yes, then you can have an expert duel and the experts can decide, the jury can decide which expert is correct. But I know of no case, they haven't cited one, I've been doing this for a long time, but I know of no case where an expert says, I'm going to assume that the purchases were made before the statute. I'm going to assume they were made the day the statute started to run, and therefore they're all within the statute of limitations. And I'm going to assume that people who had no interest in buying bus routing software, they would have bought it, too. And not only that, they would have bought the Cadillac with bus routing service. They wouldn't have bought a Chevy. They would have bought a Cadillac with every extra on it, every single one. And look what he did. He took 1,500 lay law customers, 1,500. That's that sheet that counsel is talking about. And he said every one of these people would have bought routing software, every single one, when the facts are that when Edulog had the right and they had the right during the entire period of time, 90% and from 97 on, they had 100% of the market. When they were selling it themselves, they had a 5% market share. So that fact, I think, makes it very clear that the basis of his opinion was pure speculation. It was pure assumption. It wasn't based upon any analysis that the courts recognized. Again, there's two ways to do it. Look at what this particular plaintiff did elsewhere. That's a really good way to do it. So if Edulog was getting 90% of the market elsewhere, 70% of the market elsewhere, great. Look at the McLaren case, Your Honor. There the assumption was the trial court said 21%. I'm going to assume the court said they got 21% of the market. This court said that's not good enough. We're not going to allow that because in that case, the plaintiff really only had 5% of the market. Here it's worse. Here Mr. Beaton said 100%. If you build it, they will come. Am I correct in assuming that somebody during the course of the trial made the arguments you're making now to the jury? Your Honor, these arguments were made. And there was voir dire. Right. The judge didn't allow a Daubert hearing, but there was voir dire. We're not saying the argument wasn't made. What we're saying is that doesn't cure it. There are a lot of cases where damage reports are thrown out by the appellate courts because the appellate court has decided that the judge didn't undertake his gatekeeping function. I mean, the Supreme Court made that crystal clear in Daubert. There is, yes, Your Honor. Can I make a suggestion? I'm looking at your time, and I'm not sure you want to use all your time on this argument. Let me address the consequential damage issue. And would you address the question I have, which is it appeared that there was consequential damages instruction, which made some sense to me, but then it was withdrawn. So the jury was never asked to make that decision. That's correct. The trial judge decided, Your Honor, that he would deal with that after the trial. And he said so. There was a jury instruction, Your Honor, is correct. Some rejected motions were made. The judge said, I'm going to defer it. I'm going to wait until the trial's over, and then I'll deal with it. So we dealt with that on the post-trial order. You agreed to that. Pardon me, Your Honor? That wasn't just the trial judge. You said that was the judge. Well, the judge said that's what he was going to do. Well, why did he say in his statement that comment about they're not, you know, that these are actually general damages, not consequential damages? Because, Your Honor, on that issue, I believe the district court erred. One important fact here, this contract was subject to the UCC, Section 23. The district judge didn't even mention the UCC. The district judge's analysis was, okay, consequential damages, they're out, but citing Green v. Wolf, a Montana Supreme Court opinion, where the Montana Supreme Court referred to common law, and a common law, an exception would be if the object or inducement to enter a contract is such, then even though they're lost profits, which typically are consequential, we're going to let that go. But the UCC doesn't provide for that. Counsel, let me ask you something. If we have a jury verdict that said that Laidlaw didn't use best efforts, and if we bought into your argument that despite that jury verdict, these were all consequential damages, what damages could Edula recover? Well, they could have covered the good question, Your Honor. They could have covered, there would be cover damages. So that, for example, they could have gone out and gotten their own sales force, which they did. Or they could have hired somebody else and had them sell. And then they could have gotten damages for that. Also, Your Honor, they got over. But they didn't do that. They didn't have to do that under the contract. Or under the UCC. Well, under the contract, Your Honor, there are consequential damages that were waived and there wasn't an exception, we believe. Well, if you look at the types of consequential damages that were waived in that provision, do you see anything that even remotely resembles the kind of damages? They're talking about lease agreements, talking about personal service contracts. Do you really think those are analogous to the kind of damages we're talking about here? I don't think, Your Honor, I don't think anybody has argued that these were not lost profits damages. I mean, they clearly are lost profits damages. And the definition of a consequential damage is that the definition of a consequential damages are damages that are foreseeable but not necessary. Foreseeable but not necessary. And that typically is lost profits damages. And the judge's analysis was? They're lost profit damages that are expected from third-party contracts. That's correct, Your Honor. They're not lost profit damages that are the direct inducement of why these parties made an agreement. Your Honor, these parties made an agreement. If you look at Section 4.1, it says what the inducement was for the non-exclusive. It was $1.5 million. And remember, Your Honors, they received, EDULOG received $1.5 million up front. Up front. Why did they do that? Because they wanted some protection. And so they negotiated that. And part of the bargain was they waived consequential damages. And the exception and the contract provided for UCC application. So there's no remedy for the lack of using best efforts? No, Your Honor. Your Honor, respectfully, I said the remedy was they could cover or they could go out, hire their own sales force, get other people to sell it, and they could sue for that. That was one remedy. The other remedy was they already received $1.5 million when they entered into the contract. That was an advanced payment. Laidlaw had every interest to try to sell some product. They were out $1.5 million on the non-exclusive portion of the contract. And, Your Honors, so, I mean, there was a remedy. Judge Malloy did not recognize the UCC application here. And if you look at the authorities we cite, the Strassler case and others, under the UCC, there is no exception for the consequential damage, there's no exception. But even if there was, and I know this very briefly, even if there was, the requirement under Green v. Wolf, the case Judge Malloy cited, is that both parties agree, both parties understand that the damages would otherwise be acceptable. And here there was no, there can be no understanding, and the judge didn't cite anything, that Laidlaw thought that it had a best efforts obligation, that was key to the contract during the non-exclusive period. And when Judge Malloy, in his post-trial order, said that, he didn't cite anything to the record, he didn't cite the UCC, Edgelog didn't cite the UCC, and the contract specifically provided for UCC application, and even went so far as saying services are goods under the UCC. And, Your Honors, respectfully, you start out when you interpret a contract. What does the contract say? What do the parties mean? There's an integration clause in this contract. Testimony by Dr. Nguyen, the principal of Edgelog. Yes, he said there were other things I was thinking about, but it's not a subjective intent. You have to look at the contract, you have to see what the parties agree to, and the trial judge, respectfully, is not at liberty to change the deal. And he's not at liberty to accept parole evidence. Thank you, Your Honors. Just a few quick points. With respect to the UCC, their analysis is completely backwards. Edgelog was not the buyer here, they were the seller. The good was the software. The software went from Edgelog to Laidlaw. Laidlaw agreed to use their best efforts and pay royalties and fees to Edgelog in exchange for that software. It's not a UCC, buyers lost profits, consequential damages case. With respect to briefly on this acceleration assumption argument, that, of course, is a term coined by Laidlaw. That relates to the circumstance where, as this court already acknowledged in its original order, is that the agreement is properly characterized as a contract with continuing obligations capable of distinct and separate breaches. What we're talking about here are Laidlaw customers. For example, a customer that might have become a customer in 2001 remains a customer today. And Laidlaw says, well, these customers showed no intention of wanting software. Well, guess what? Laidlaw is making the decisions. Laidlaw says all school districts are better off with routing software, but they have a policy of not promoting. These school districts never even offered software. They weren't told what they were missing. That's on Laidlaw. That's not on Edgelog. With respect to this market analysis, we're not talking about a market analysis case. We're not talking about something else that's going on in the market. I mean, the market said that TransFinder, so TransFinder had the biggest share of the market according to this trial testimony. Laidlaw says, we don't use TransFinder because it stinks. We're not going to use that for our customers. This isn't about the market. This is about Laidlaw's own customers. And Laidlaw's internal memos, not for customer site or not for Edgelog site, it endorses Edgelog. Edgelog is the best product. It gets the best school district savings. Laidlaw won't tell anybody that. And finally, I'd like to end on this point. What did the contract say? That's what Laidlaw counsel just asked you. The contract said Laidlaw will use its best efforts to promote the software. And it says that Laidlaw will pay fees and it will pay royalties. That's the party's intent. It's clear on the face of the contract. The party's intended for Laidlaw to hold up its end of the bargain and then to pay the fees and royalties that were due. Unless there are further questions. I think not. Thank you both for your argument and also for a very extensive briefing. We appreciate that. The case just argued of Edgelog v. Laidlaw is submitted and we're adjourned.
judges: Rothstein, McKEOWN, WATFORD